# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | |
|---|---|
| JANET KNOSTMAN, | :   Case No. 3:16-cv-439 |
|       Plaintiff, | : |
| vs. | :   Magistrate Judge Sharon L. Ovington |
| | :   (by full consent of the parties) |
| NANCY A. BERRYHILL, | : |
| COMMISSIONER OF THE SOCIAL | : |
| SECURITY ADMINISTRATION, | : |
|       Defendant. | : |

---

## DECISION AND ENTRY

---

## I.    **Introduction**

Plaintiff Janet Knostman brings this case challenging the Social Security Administration's denial of her application for Disability Insurance Benefits.  After working as a nurse for over thirty years, she applied for benefits on February 3, 2014, asserting that she could no longer work a substantial paid job due to anxiety, depression, and memory loss.  Administrative Law Judge (ALJ) Benjamin Chaykin concluded that she was not eligible for benefits because she is not under a "disability" as defined in the Social Security Act.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #12), Plaintiff's Reply (Doc. #13), and the administrative record (Doc. #7).

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Chaykin's non-disability decision.

## II.   Background

Plaintiff asserts that she has been under a "disability" since January 10, 2014. She was fifty-five years old at that time and was therefore considered a person of "advanced age" under Social Security Regulations. *See* 20 C.F.R. § 404.1563(e). She has a high school education. *See id.* § 404.1564(b)(4).

### A.    Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Chaykin that she has been unable to work because of her short memory, anxiety, and depression. (Doc. #7, *PageID* #s 236-37). She has crying spells "[a]t least every other day." *Id.* at 246. She loses her concentration easily—"I will actually ask a question, and someone will answer me, and I'll just kind of look at them like I don't know what they're talking about." *Id.* at 236-37, 247. She has trouble making decisions. *Id.* at 246. When she has a task, she gets overwhelmed easily. *Id.* But, she is "trying to learn how to compartmentalize them and make them smaller, but [she hasn't] been able to accomplish that just yet." *Id.* at 247.

She sometimes has the feeling that she wants to end her life. *Id.* "I feel like I'm not contributing to my household, and I was a productive citizen … I did nursing -- hard nursing -- ICU nursing and radiology nursing, and I took care of really sick patients. And I managed a facility, and I was over the nurses. And … I just feel like I don't contribute

anymore. And it's really hard to even ask for help." *Id.* at 246. Plaintiff sees her counselor, Deborah Zunke every two to three weeks. *Id.*

Plaintiff has some problems with her left knee. *Id.* at 237. It does not hurt all of the time but does if she stands for twenty minutes or more. *Id.* at 238. She had an arthroscopic procedure done and went to rehab. *Id.* She tries to remember to do therapy at home. *Id.* When it bothers her, she takes ibuprofen. *Id.* at 239. She estimated that, because of her knee, she can only lift eight to ten pounds. *Id.* at 249.

Plaintiff has a neurological problem with her right hand, and although she is right handed, she tries to write with her left hand. *Id.* at 232-33. If she tries to do "fine motor movement things, like writing or doing something precise" with her right hand, she experiences pain. *Id.* at 233.

Plaintiff last worked—about three years before the hearing—as a nurse at a vascular center. *Id.* at 235. Her psychological problems started causing issues at her job in 2009 but she continued to work until 2014. *Id.* at 248. She explained that she "just kept trying" and told herself that she could work through it. *Id.* She wanted to work—"I was making good money, and I was providing good care. And I cared about my patients. And to suddenly admit you don't know what you're talking about is very difficult when you've been trained to do just that." *Id.* She quit because "I just felt like I was pretending. I couldn't remember things. I'd have to ask the doctors things over and over again. …" *Id.* at 236.

On a typical day, Plaintiff's dogs usually wake her up in the morning. *Id.* at 242. Her boyfriend leaves a coffee cup, coffee, and creamer out for her so she does not get

confused.  *Id*.  Her dogs' food bowls are on the counter with food in them and she adds a little broth and feeds them.  *Id*.  Her boyfriend also gets her medication out and leaves her a list of things she could or should do.  *Id*.  For example, he will note whether she has any appointments that day or whether the laundry or vacuuming needs to be done.  *Id*.  She uses the internet to do her bills almost every day.  *Id.* at 243.  She checks on them daily because she gets nervous and worries that they are not getting paid on time.  *Id*.

In a typical month, Plaintiff has five to six "good days."  *Id.* at 245.  "On a good day, I can start a task and complete it.  And … on a bad day, I will start a task and halfway through it start another task.  It's like you go to put a shirt away and then you realize the closet's messy and then you start the closet.  So by the end of the day, everything's a mess and nothing's complete."  *Id*.  On days when she feels very nervous, she takes an anti-anxiety pill and then gets sleepy.  *Id*.

Plaintiff has a driver's license and usually drives a couple times a week.  *Id.* at 234.  But, because she "tend[s] to get lost easily[,]" she typically only drives to her counselor's office and sometimes to her doctors' appointments.  *Id*.  On a good day, she may go to the grocery store.  *Id*.

**B.  Medical Opinions**

**i.  Polina Sadikov, M.D.**

Dr. Sadikov, Plaintiff's treating physician of twenty years, completed interrogatories on July 10, 2015.  *Id.* at 811-19.  She has treated Plaintiff for depression, anxiety, and insomnia.  *Id.* at 812.  Dr. Sadikov opined that she is not able—on a regular, sustained basis, in a routine work setting—to be prompt and regular in attendance

because of the side effects of her medication and her sleep problems. *Id.* at 813. She is not able to respond appropriately to changes in a routine work setting or respond appropriately to supervision, coworkers, and customary work pressures. *Id.* at 814, 817. "She gets stressed and upset easily, [and] has difficulties dealing with stress." *Id.* In addition, she has poor coping skills. *Id.* at 813. Her memory is also affected by her depression and anxiety. *Id.* at 815. As a result, she is not able to understand, remember, and carry out simple work instructions. *Id.*

Dr. Sadikov opined Plaintiff has a moderate restriction of her activities of daily living; marked difficulties in maintaining social functioning; and marked difficulties in maintaining concentration, persistence, or pace. *Id.* at 819. Plaintiff would, on average, be absent from work more than three times per month due to her impairments and treatment. *Id.*

### ii. Deborah Zunke, PCC-S

On August 20, 2015, Ms. Zunke, Plaintiff's treating counselor, completed interrogatories and a mental impairment questionnaire. *Id.* at 1165-76. She indicated Plaintiff has major depression, recurrent, moderate, and panic disorder with agoraphobia. *Id.* at 1174. Despite Plaintiff's treatment—individual counseling—her symptoms are getting worse. *Id.* at 1175. However, she is having less suicidal thoughts. *Id.* Her prognosis is cautious. *Id.* Ms. Zunke opined that Plaintiff cannot be prompt and regular in attendance "due to frequent emotional disturbances that result in confusion of time management or absence." *Id.* at 1167. She cannot respond appropriately to supervision and coworkers because she "becomes easily overwhelmed and overly concerned[,]

5

almost paranoid[,] about [their] thoughts of her." *Id.* at 1168. Additionally, she is not able to sustain attention and concentration on her work to meet normal standards of work productivity and accuracy. *Id.* Ms. Zunke explained, "She loses concentration frequently during counseling sessions. [Her] mind goes blank in the middle of a sentence at least one time per hour." *Id.*

Plaintiff has a marked restriction of activities of daily living; marked difficulties in maintaining social functioning; and extreme difficulties in maintaining concentration, persistence, or pace. *Id.* at 1173. She would, on average, be absent from work "almost daily" due to her impairments and treatment. *Id.* at 1176. In an eight-hour workday, she would likely be distracted by her psychological symptoms all of the time. *Id.* She is not able to perform full-time-competitive work over a sustained basis without missing work more than two times per month or being off task more than fifteen percent of the work day due to her impairments, her medical appointments, and/or her treatment. *Id.*

### iii. Jeffrey Bishop, M.D.

Dr. Bishop, Plaintiff's treating psychiatrist, completed interrogatories and a mental impairment questionnaire on September 1, 2015. *Id.* at 1083-94. He diagnosed major depression and identified several of her signs and symptoms—poor memory, sleep disturbance, mood disturbances, emotional lability, difficulty thinking or concentrating, social withdrawal or isolation, decreased energy, and generalized persistent anxiety. *Id.* at 1092. He further explained that she "has endogenous depression with most of the

neurovegetative signs."[1] *Id.* Her response to treatment has been "mild to moderate" but she still has low mood, crying spells, poor concentration, and low energy. *Id.* Her prognosis is fair. *Id.*

Dr. Bishop opined Plaintiff has a marked restriction of activities of daily living; marked difficulties in maintaining social functioning; and marked difficulties in maintaining concentration, persistence, or pace. *Id.* at 1091. On average, she would likely be absent from work more than three times per month due to her impairments and treatment. *Id.* at 1094. In an eight-hour workday, she would likely be distracted by her psychological symptoms two-thirds of the time. *Id.* She is not able to perform full-time-competitive work over a sustained basis without missing work more than two times per month or being off task more than fifteen percent of the work day due to her impairments, her medical appointments, and/or her treatment. *Id.* He opined, "She has severe depression and anxiety [and] would not function well in a competitive environment." *Id.* at 1084.

### iv.    Donald J. Kramer, Ph.D.

Dr. Kramer evaluated Plaintiff on April 8, 2014. *Id.* at 577-81. He diagnosed major depression, recurrent, and generalized anxiety disorder. *Id.* at 580. Her prognosis "appears to be uneven." *Id.* He observed during the exam that Plaintiff's affect was

---

[1] Endogenous means "[p]roduced or originating from within a cell or organism," and "neurovegetative" is defined as "[c]oncerning the autonomic nervous system." Taber's Cyclopedic Medical Dictionary, pp. 673, 1389-90 (19th ed. 2001).

depressed and she was tearful off and on. *Id.* at 579. Additionally, she "was somewhat tense, nervous, and anxious with pressured speech …." *Id.*

Dr. Kramer opined that Plaintiff was of average intelligence. *Id.* at 581. He noted she has a bachelor's degree in nursing and worked for thirty years. *Id.* However, she reported that during the last several years, "her concentration[,] focus[,] and short-term memory became impaired to the point that she was making mistakes on the job, and she attributes this to her increased levels of anxiety and depression." *Id.* He opined that she "appears to have the intellectual ability to perform simple as well as multi-step tasks. Her concentration, attention, persistence and pace were adequate in [the] examination." *Id.* But, Plaintiff reported that she is "very distractible" and "can no longer perform multi-step tasks[.]" *Id.* Further, "her high level of emotional distress was affecting her work performance." *Id.*

### v.      Jerry E. Flexman, Ph.D.

Dr. Flexman evaluated Plaintiff and administered several tests on December 2, 2014. *Id.* at 613-17. On the Structured Inventory of Malingered Symptoms and Test of Memory Malingering, Plaintiff had elevated scores, "suggesting strong tendencies to overreact to problems and difficulties, especially having to do with affective issues and memory issues [and] problems with the reliability and validity of the evaluation." *Id.* at 615. Her responses on the Millon Clinical Multiaxial Inventory also suggested "tendencies to exaggerate and over-respond." *Id.* at 616.

Nevertheless, "[i]n viewing the profile with caution, moderate levels of depression were indicated, with significant dysthymic symptoms." *Id.* Moderate levels of anger,

impulse control issues, difficulties in social relationships, and strong dependency needs were noted. *Id.* "Strong self-defeating patterns are indicated. Avoidant and dependent personality features are seen, with dependent features being predominant." *Id.*

Although Plaintiff scored above average in reading and word recognition in Achievement Testing, Dr. Flexman indicated that her "reading comprehension was below the 1st percentile, in the mild range of retardation, well below expectations for her educational background." *Id.* at 615. She scored in the very-low-average-to-borderline range of functioning for both immediate and delayed memories on the Wechsler Memory Scale 4th Edition. *Id.* "On Word Fluency her internal focus of attention was lower than expected for both categorized and uncategorized items, suggesting some difficulty with her internal focus of attention on tasks." *Id.*

Based on these results, among many others, Dr. Flexman opined, "the results of the current evaluation [of] [Plaintiff] are not indicative of an organic cognitive impairment. We note that the test results are viewed with a great deal of caution due to three validity tests …. In viewing the other aspects of the testing, … innate intellectual levels of functioning appeared to be in the high average range. No specific verbal or nonverbal processing difficulties were indicated. …. Depressive symptomatology and anxiety are indicated. Strong tendencies for somatization are indicated. Unmet dependency needs are underlying personality and emotional factors which I believe are affecting her primary complaints." *Id.* at 617.

### vi. Tonnie Hoyle, Psy.D., & Leslie Rudy, Ph.D.,

On April 21, 2014, Dr. Hoyle reviewed Plaintiff's records. *Id.* at 268-81. She found Plaintiff had two severe impairments: affective disorders and anxiety disorders. *Id.* at 275. Dr. Hoyle opined she had a mild restriction in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. *Id.*

Dr. Hoyle found that Plaintiff is able to perform simple and multi-step tasks. *Id.* at 278. She "would most likely have decreased productivity due to psych symptoms[,]" and as a result, her tasks must not require strict production quotas or frequent changes and should be "somewhat static." *Id.* at 278-79. "She is capable of interacting occasionally and superficially with others in a work setting." *Id.*

Dr. Rudy reviewed Plaintiff's records on July 17, 2014, and she affirmed most of Dr. Hoyle's assessment. *Id.* at 283-93. However, Dr. Rudy opined Plaintiff is able to understand, remember, and perform only one to four step tasks. *Id.* at 289-90. She "is capable of adapting to occasional changes with some supervisory support." *Id.* at 291.

## III. <u>Standard of Review</u>

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that

precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. § 423(d)(1)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance …." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to

follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV.  __The ALJ's Decision__

As noted previously, it fell to ALJ Chaykin to evaluate the evidence connected to Plaintiff's application for benefits.  He did so by considering each of the five sequential steps set forth in the Social Security Regulations.  *See* 20 C.F.R. § 404.1520.  He reached the following main conclusions:

Step 1:   Plaintiff has not engaged in substantial gainful employment since January 10, 2014.

Step 2:   She has the severe impairments of depression and anxiety disorder.

Step 3:   She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:   Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec*., 276 F.3d 235, 239 (6th Cir. 2002), consists of "a full range of work at all exertional levels but with the following nonexertional limitations:  [Plaintiff] can perform simple, routine, and repetitive tasks but not at a production rate pace or involving strict quotas.  She can have occasional interaction with supervisors, coworkers, and the public.  She is limited to simple instructions and simple work-related decisions in a static work environment, with few changes in the work setting."

Step 4:   She is unable to perform any of her past relevant work.

Step 5:   She could perform a significant number of jobs that exist in the national economy.

(Doc. #7, *PageID* #s 207-15).  These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability.  *Id.* at 215.

## V.  Discussion

Plaintiff contends that the ALJ failed to properly weigh the medical opinions.  The Commissioner maintains that substantial evidence supports the ALJ's assessment of the medical evidence.

### A.  Medical Opinions

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions.  "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule."  *Rogers,* 486 F.3d at 242 (citations omitted).  The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors."  *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id.* (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id.* Substantial evidence must support the reasons provided by the ALJ. *Id.*

In the present case, the ALJ noted that he "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." (Doc. #7, *PageID* #211). The ALJ thus cited the applicable Regulation and Rulings, but he did not separately describe the legal criteria described in the Regulation and Rulings. The Court must therefore scrutinize the ALJ's decision to determine whether he applied the correct legal criteria when evaluating medical source opinions. *See Bowen,* 478 F.3d at 746.

### Dr. Sadikov

ALJ Chaykin assigned the opinions of Plaintiff's treating physician, Dr. Sadikov, "little weight." (Doc. #7, *PageID* #212). He provided a few reasons for the weight and, although he does not refer to the treating physician rule, he appears to have addressed it to some degree.

Looking at the first condition—whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques—the ALJ found that Dr. Sadikov's opinion is not well supported and that she "provides a conclusory

statement without any supporting reasons." *Id.* at 212-13. He did not provide any further detail or citation to the record. And, the ALJ gives no indication of which "statement" he is referring to.

Substantial evidence does not support the ALJ's conclusion. Notably, under the treating physician rule, "For a medical opinion to be well-supported by medically acceptable clinical and laboratory diagnostic techniques, it is not necessary that the opinion be fully supported by such evidence." Soc. Sec. R. 96-2p, 1996 WL 374188, at *2.

Dr. Sadikov's opinion is supported by opinions of Dr. Bishop, Plaintiff's treating psychiatrist, and Ms. Zunke, her counselor. For example, all three opined Plaintiff would be absent from work more than three times a month due to her impairments and/or treatment. (Doc. #7, *PageID* #s 819, 1094, 1176). They further agreed Plaintiff had marked difficulties in maintaining social functioning and at least marked deficiencies of concentration, persistence, or pace. *Id.* at 819, 1091, 1173. They all also opined she could not—for instance—be prompt and regular in attendance; respond appropriately to supervision, co-workers, and customary work pressures; sustain attention and concentration on her work to meet normal standards of work productivity; or behave in an emotionally stable manner. *Id.* at 813-15, 1085-87, 1167-69.

Further, Dr. Sadikov's opinion is supported by her treatment notes. For example, she noted in January 2014 that Plaintiff was nervous, anxious, upset, tearful, and not able to concentrate. *Id.* at 707. Her mood was dysphoric. *Id.* She had some suicidal ideations but no plan. *Id.* She was experiencing sleep disturbance. *Id.* In February

15

2015, Plaintiff was upset and crying. *Id.* at 857. Dr. Sadikov noted that her depression

"is a chronic problem" that "occurs intermittently." *Id.* Her current episode began over a

year before that appointment. *Id.* "The problem has been waxing and waning. … The

symptoms are aggravated by stress. … The treatment provided no relief." *Id.*

Additionally, in July 2015, Plaintiff looked tired and was tearful, nervous, anxious, and

depressed. *Id.* at 858. She reported that "she thinks of suicide all the time but does not

have a plan and is not going to do that because of her family." *Id.* As explained in more

detail below, treatment notes from Plaintiff's other providers also support Dr. Sadikov's

opinion.

The ALJ also concluded that Dr. Sadikov "appears to base her opinion on the

subjective complaints of [Plaintiff], which are most likely exaggerated per the findings of

Dr. Flexman's evaluation." *Id.* at 213 (citing 12F). This, however, is not a reasonable

assumption because Dr. Sadikov did not indicate in any way that she relied only on

Plaintiff's subjective reports and because physicians are trained to both consider and

investigate subjective reports as opposed to blindly accepting them on face value. *See*

*Felisky v. Bowen,* 35 F.3d 1027, 1040 (6th Cir. 1994) ("a physician's job is not to

question his or her patient's statements, but is rather to match those statements with a

diagnosis.").

Turning to the second condition of the treating physician rule—whether the

opinion is not inconsistent with the other substantial evidence in the record—the ALJ

found that "Dr. Sadikov's opinion is inconsistent with the medical evidence of record, as

discussed above, which indicates more moderate limitations." (Doc. #7, *PageID* #213). The ALJ did not identify which opinions were inconsistent with what evidence.

Nevertheless, even if the ALJ properly evaluated Dr. Sadikov's opinion and found it was not entitled to controlling weight, the ALJ's review is not complete. When a treating physician's opinion is not entitled to controlling weight under the treating physician rule, the opinion is "still entitled to deference and must be weighed using all the factors…." Soc. Sec. R. 96-2p, 1996 WL 374188, at *4. The ALJ addressed just one factor; he acknowledged that she has had an "established, treating relationship" with Plaintiff for over twenty years. (Doc. #7, *PageID* #212); *see* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). This reason does not constitute substantial evidence in support of the ALJ's finding that Dr. Sadikov's opinion is entitled to "little weight."

### Dr. Bishop

The ALJ assigned Dr. Bishop's opinion "little weight." (Doc. #7, *PageID* #213). Beginning with the second condition of the treating physician rule, the ALJ found that Dr. Bishop's opinion was not consistent with and was inconsistent with the medical evidence that indicated more moderate limitations. *Id.* at 213. Specifically, the ALJ noted that Dr. Bishop opined Plaintiff had "marked" limitations in each area of mental functioning. *Id.* The ALJ found these limitations were inconsistent with the global assessment of functioning (GAF) score of 55 that Dr. Bishop assigned Plaintiff. *Id.* (citation omitted).

This conclusion by the ALJ highlights significant confusion associated with GAF scores.  At the time of ALJ Chaykin's decision in February 2016, the use of GAF was no longer recognized by the American Psychiatric Association as a valid psychiatric measurement tool.  *See* Diagnostic and Statistical Manual of Mental Disorders at p. 16 (Am. Psych. Ass'n, 5th ed. 2013) (DSM-V) (eliminating GAF upon the recommendation "that the GAF be dropped from [DSM-V] for several reasons, including its conceptual lack of clarity ... and questionable psychometrics in routine practice").  Consequently, Plaintiff's GAF ratings were not reasonably probative evidence in conflict with Dr. Bishop's opinions, *see Barnett v. Colvin*, 2015 WL 471243, at *11 (S.D. Ohio 2015) (R&R adopted, 2015 WL 777646) (Feb. 24, 2015)) (quoting *Oliver v. Comm'r of Soc. Sec.*, 415 F. App'x 681, 684 (6th Cir. 2011) ("'A GAF score is thus not dispositive of anything in and of itself ....'")).[2]

Turning to the first condition of the treating physician rule, the ALJ found, "He provides no analysis to support his conclusory statement that [Plaintiff] suffers from 'severe depression and anxiety & would not function well in a competitive environment.'"  (Doc. #7, *PageID* #213) (quoting 16F/1-2 [Doc. #7, *PageID* #s 1083-84]).  But the ALJ ignores that the question asked Dr. Bishop to "please explain, as

---

[2] In a 2016 case, *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 836 (6th Cir. 2016), the Sixth Circuit continued to acknowledge the GAF's usefulness to ALJs.  *Miller*, however, relied on a case from 2012, *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002), which was decided well before the DSM V dropped the GAF scale in 2015.  Additionally, *Miller* evaluated an ALJ's decision in 2011 before the DSM V eliminated the GAF scale in 2015.  And, *Miller* is silent about whether ALJs may use GAF scores to discount a treating psychiatrist's opinions after DSM V dropped the GAF scale.  *Miller* is therefore distinguished from the present case, which addressed ALJ Chaykin's May 2016 decision, after the effective date of DSM V.

directly as you can and in terms that would understandable to layman, your reasons for stating that the total disabling effect of her impairment during the time you treated her was greater than the sum of her physical and mental impairments taken independently." *Id.* at 1084. It did not ask Dr. Bishop to provide analysis or identify evidence is support of his conclusion.

His opinion, moreover, is supported by his treatment notes. They reveal that although Plaintiff's symptoms improved at some points, her conditions remained unstable, as evidenced by Dr. Bishop's regular adjustment of her medications. For example, in January 2015, Plaintiff was "[d]oing fairly well." *Id.* at 605. But, she was "still very emotional." *Id.* Accordingly, Dr. Bishop increased one of her medications, Cymbalta. *Id.* Unfortunately, her insurance would not cover the increased amount, and Dr. Bishop added a new medication—desipramine—to help with her continued difficulties with emotionality and anxiety. *Id.* at 603.

Interestingly, the ALJ does not recognize that in April 2015, Dr. Bishop notes that results from Dr. Flexman's testing "showed depressive and anxious [symptoms] but also a tendency to over report [symptoms]. *Id.* And yet, having those results, Dr. Bishop did not change his assessment of Plaintiff's impairments and, he prescribed her a new medication to help with her continued anxiety and emotionality. *Id.* Notably, he provided his opinion in September 2015—after seeing the results of Dr. Flexman's testing.

As was the case with Dr. Sadikov, even if Dr. Bishop is not entitled to controlling weight under the treating physician rule, "Treating source medical opinions are still

entitled to deference and must be weighed using all of the factors provided in 20 C.F.R.

§§ 404.1527 and 416.927." Soc. Sec. R. 96-2p, 1996 WL 374188, at *4. Again, ALJ

Chaykin only considers one factor: He recognizes that Dr. Bishop had treated Plaintiff

for over one year—January 2014 to July 2015. (Doc. #7, *PageID* #213).

*Ms. Zunke*

The ALJ correctly observed that Deborah Zunke, as a counselor, is not considered

an "acceptable medical source" under the Regulations. *Id.* at 213; *see* 20 C.F.R. §

404.1513. Instead, she falls under the category of "other sources." *Id.* § 404.1513(d).

Evidence from "other sources" can only be used to show the severity of impairments and

how it affects the claimant's ability to work. *Id.* While an ALJ is required to weigh and

provide "good reasons" for discounting the weight given to a treating source opinion, an

ALJ is not required to explain the weight given to "other sources." *Gayheart,* 710 F.3d at

376; Soc. Sec. R. 06-03p, 2006 WL 2329939, at *6 (Soc. Sec. Admin. Aug. 9, 2006).

Although not required, "the adjudicator generally *should* explain the weight given to

opinions from these 'other sources,' or otherwise ensure that the discussion of the

evidence in the determination or decision allows a claimant or subsequent reviewer to

follow the adjudicator's reasoning…." Soc. Sec. R. 06-03p, 2006 WL 2329939, at *6

(emphasis added). The same factors used to evaluate acceptable medical sources can be

used to evaluate opinions from other sources. *Id.* at *4-5. These factors include, but are

not limited to, the length and frequency of the relationship, how consistent the opinion is

with other evidence, the degree to which the source presents relevant evidence to support

20

an opinion, how well the source explains the opinion, whether the source has a specialty or area of expertise, and other factors that tend to support or refute the opinion. *Id.*

The ALJ was not required to explain the weight assigned to Ms. Zunke's opinion. However, because Ms. Zunke's treatment of Plaintiff overlaps with Dr. Sadikov's and Dr. Bishop's treatment and resulting opinions, it is particularly relevant to this case. Additionally, the Social Security Administration recognized, "With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources'… have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled by physicians and psychologists." Soc. Sec. R. 06-03p, 2006 WL 2329939, at *3.

ALJ Chaykin assigned Ms. Zunke's opinion "little weight" and provided several reasons. (Doc. #7, *PageID* #213). He recognized that "Ms. Zunke's opinion includes greater supporting analysis in comparison with the opinions of [Plaintiff's] other treating sources." *Id.* Nonetheless, he found her opinions "appear to be based on an uncritical acceptance of [Plaintiff's] subjective allegations." *Id.* The ALJ also found that her opinions—particularly her belief that Plaintiff had a marked restriction in activities of daily living; marked difficulties in maintaining social functioning; and extreme deficiencies in concentration, persistence, and pace—"are an overestimate of [Plaintiff's] limitations." *Id.* And the ALJ concluded that her opinions are not consistent with the medical evidence. *Id.*

Substantial evidence does not support most of the reasons provided by the ALJ. Most significantly, as explained in more detail above, the ALJ ignores that Ms. Zunke's

opinion is consistent with the opinions of Plaintiff's treating physicians. He also ignores

that her opinion is consistent with her treatment notes. For example, Ms. Zunke noted in

February 2015, "She is so overwhelmed [with] guilt [and] anxiety that she isn't able to

make simple decisions. … She is aware she is too concerned about what people think of

her [and] she knows it is not worth being concerned, but [she] can't let the thoughts go."

*Id.* at 641. She observed in March 2015 that Plaintiff's mood was depressed and she

"feels she is a failure." *Id.* at 637. Further, Plaintiff was a danger to herself as she had

both suicidal ideation and a plan. *Id.* However, her plan involved using her car in her

garage. *Id.* But, her car does not fit into her garage. *Id.*

### Dr. Kramer, Dr. Hoyle, & Dr. Rudy

The ALJ assigned the opinions of Dr. Kramer, Dr. Hoyle, and Dr. Rudy "great

weight" because "they are consistent with the totality of the evidence in this case." (Doc.

#7, *PageID* #212) (citation omitted). The ALJ provides no further explanation. This

constitutes error because "[u]nless a treating source's opinion is given controlling weight,

the administrative law judge must explain in the decision the weight given to the opinions

of a State agency medical or psychological consultant…." 20 C.F.R. §

404.1527(e)(2)(ii). In addition, the ALJ erred by failing to apply the same level of

scrutiny to reviewing  and consulting psychologists' opinions as he applied to treating

sources' opinions. *See Gayheart,* 710 F.3d at 379 (citing 20 C.F.R. § 404.1527(c); Soc.

Sec. R. 96-6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996)) ("A more

rigorous scrutiny of the treating-source opinion than the nontreating and nonexamining

opinions is precisely the inverse of the analysis that the regulation requires."). For

example, the ALJ does not acknowledge any differences between the three somewhat divergent opinions. Similarly, he does not discuss inconsistencies with Plaintiff's treating sources' opinions or their treatment notes.

*Dr. Flexman*

The ALJ assigned Dr. Flexman's opinion "great weight" because it "is supported by clinical tests and is consistent with the remainder of the record in this case …." (Doc. #7, *PageID* #213). The tests administered by Dr. Flexman, according to the ALJ, "resulted in somewhat skewed results." *Id.*

> For example, on the Structured Inventory of Malingered Symptoms, [Plaintiff] had a "significantly elevated" score that showed "strong tendencies to overreact to problems and difficulties, especially having to do with affective issues and memory issues." She also had elevated scores on the Test of Memory Malingering, "suggesting problems with the reliability and validity of the evaluation." "Achievement Testing results were even confusing because, although [Plaintiff] graduated college with a nursing degree and had a successful nursing career, she scored well below expectations; [Plaintiff] scored in the "mild mental retardation" range for reading comprehension, which is inconsistent with her educational background and vocational experience. Dr. Flexman concluded that, overall, the results were "viewed with a great deal of caution due to three validity tests which indicated strong tendencies to exaggerate and over-respond to problems and difficulties."

*Id.* The ALJ does not mention any of the other tests administered by Dr. Flexman, and there were many: Attention Deficit Disorder Evaluation Scale, Neurocognitive Exam, Wechsler Memory Scale 4th Edition, Word Fluency, Bender-Berea Visual Motor Gestalt Test, Clock Drawing Test Part A and Part B, Trailmaking Test Part A and Part B,

Integrated Visual and Auditory Continuous Performance Test, Projective Drawing Test, and Million Clinical Multiaxial Inventory. *Id.* at 615-16.

Further, the ALJ does not identify any evidence that is consistent with Dr. Flexman's opinion. This absence is particularly problematic because no other psychiatrist, psychologist, or physician suggests that Plaintiff exaggerated her symptoms or over-responded to problems. As mentioned above, Dr. Bishop noted the results of Dr. Flexman's opinion but did change his treatment plan or indicate that he agreed with Dr. Flexman. Further, Dr. Kramer indicated that Plaintiff "appeared to be a reliable informant. She seemed to be open and honest in sharing information, and her self-report was consistent with the clinical impression obtained in today's interview." *Id.* at 580. Dr. Hoyle and Dr. Rudy found Plaintiff's "statements about her symptoms and their functional effects are fully credible and consistent with the evidence. Her statements do not appear to exaggerate or minimize her statements." *Id.* at 276, 289. This, of course, flies in the face of Dr. Flexman's opinion.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.

## B. Remand

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's

opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether her application for Disability Insurance Benefits should be granted.

**IT IS THEREFORE ORDERED THAT**:

1.      The Commissioner's non-disability finding is vacated;

2.      No finding is made as to whether Plaintiff Janet Knostman was under a "disability" within the meaning of the Social Security Act;

3.      This matter is **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Decision and Entry; and

4.      The case is terminated on the Court's docket.

Date: March 28, 2018                    *s/Sharon L. Ovington*
                                        Sharon L. Ovington
                                        United States Magistrate Judge